## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| THE HISTORIC GREEN SPRINGS, INC., REGINALD MURPHY, JANE STUART MURPHY, SERGIO SOBRAL, and GAIL FLEURY SOBRAL,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LISA P. JACKSON, as ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, WILLIAM C. EARLY, as ACTING REGIONAL ADMINISTRATOR OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION III, and LOUISA COUNTY WATER AUTHORITY,<br><br>*Defendants.* | CASE NO. 3:09-cv-00075<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This matter is before the Court upon the Motion of Defendant Louisa County Water Authority to Dismiss under Rule 12(b)(6) for Failure to State a Claim and Failure to Join a Required Party, and the accompanying memorandum in support thereof, (docket nos. 12 and 13), Plaintiffs' Brief in Opposition to Motion of Defendant Louisa County Water Authority to Dismiss under Rule 12(b) (docket no. 14), Defendant Environmental Protection Agency's Motion to Dismiss, and the accompanying memorandum in support thereof (docket nos. 15 and 16), Plaintiffs' Memorandum in Opposition to Motion to Dismiss of the Defendant Environmental Protection Agency (docket no. 22), and Defendant Environmental Protection Agency's Reply in Support of its Motion to Dismiss (docket no. 26). This matter is also before the Court upon the Notice of Filing Certain State Court Records at the Request of the Court (docket no. 30), the Court's Order dated May 26, 2010,

directing additional briefing by the parties on preclusion and abstention issues potentially raised by the related state court proceedings in Louisa County Circuit Court (docket no. 33), and the parties' subsequent responses thereto (docket nos. 34, 36, 37 and 40), and the additional memoranda filed by the parties with leave of Court concerning the related state court proceedings (docket nos. 32, 39 and 42).

After full consideration of the arguments and authorities set forth in the aforementioned papers, as well as those presented at the May 17, 2010 hearing on the pending motions to dismiss, for the following reasons, the Court will GRANT Defendant Environmental Protection Agency's Motion to Dismiss (docket no. 15), and will DENY AS MOOT Defendant Louisa County Water Authority's Motion to Dismiss (docket no. 14) in an accompanying Order, to follow.

## I. BACKGROUND

Historic Green Springs, Inc. (hereinafter "HGS") is a not for profit land conservation organization established in 1970 and incorporated under the laws of Virginia. The purpose of HGS is to preserve approximately two hundred and fifty 18th and 19th century structures and the properties in the Green Springs National Historic Landmark District (hereinafter "the Green Springs Landmark District"), which is a 14,000-acre area of land administered by the National Park Service. The private landowners in the Green Springs Landmark District have voluntarily placed 13,000 of the 14,000 acres in conservation easements. Several thousand acres of conservation easements in the Green Springs Landmark District are held by HGS, and the National Park Service holds easements on approximately 8,000 acres. The purpose of the conservation easements was to "forego most or all development rights in favor of preservation of agricultural land uses and [to] protect the integrity of historic structures" within the Green Springs Landmark District. Complaint,

at ¶ 9. In fulfilling its mission, HGS is charged not only with monitoring and enforcing its easements, but also protecting against any threat that may undermine the value or effectiveness of the other easements.

HGS is aggrieved by the Zion Crossroads Wastewater Treatment Plant (hereinafter "Zion Crossroads WWTP") and the treated sewage allegedly discharged from that plant into an impoundment of Camp Creek, which is a small tributary to the South Anna River, York River, and the Chesapeake Bay. There are at least two properties in the Green Springs Landmark District upon which HGS holds land conservation easements through which Camp Creek allegedly flows.[1] Since the time the Zion Crossroads WWTP began discharging into Camp Creek, it is alleged that the Virginia Department of Environmental Quality (hereinafter "DEQ") found evidence of pollution at the location where Camp Creek flowed into Wheeler Creek. The treated sewage discharge into Camp Creek, as well as several other actions taken or in contemplation by Louisa County,[2] allegedly have had, and will continue to have, an adverse impact upon the agricultural and residential land uses of these properties.

The process by which Zion Crossroads WWTP was issued its water discharge permit is now challenged by HGS. Under the Clean Water Act, 33 U.S.C. §§ 1251-1387, it is unlawful for any party to discharge a "pollutant" from any "point source," without

---

[1] The first such property is owned by Plaintiffs Reginald and Jane Stuart Murphy, being 218 acres of land known as the Aspen Hill Farm that is located approximately 400 yards downstream of the impoundment on Camp Creek. The second such property is owned by Nancy Daniel Somoza as Trustee of the Nancy Daniel Somoza Revocable Trust, and is known as Fair Oaks. Also allegedly impacted by the treated sewage runoff are Plaintiffs Sergio and Gaily Fleury Sobral, who own the 255-acre property known as Green Springs Plantation. HGS initially held the conservation easement to Green Springs Plantation; it was later assigned to the United States Department of the Interior. Aspen Hill Farm and Green Springs Plantation are respectively the first and second farms downstream of the WWTP. Camp Creek is alleged to bisect and run through both properties, which are used for agricultural and recreational purposes. *See* Complaint, at ¶¶ 14, 16.

[2] For example, HGS notes that Louisa County has petitioned the state to allow the additional discharge of nitrogen and phosphorus into Camp Creek, and has plans to attempt to bolster development at Zion Crossroads by increasing the area water supply by several million gallons, which will apparently result in additional WWTP discharge to the Landmark District. *See* Complaint, at ¶ 11.

previously having obtained, and complying with the terms of, a National Pollution Discharge Elimination System (hereinafter "NPDES") permit. *See* 33 U.S.C. §§ 1311(a); 1342. The program is designed "to prevent harmful discharge into the Nation's waters." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007). Under the NPDES program, the EPA initially is charged with the permitting system for each state, unless and until a State applies for a transfer of that permitting authority and the transfer is approved. *Id.* at 650. In Virginia, the EPA ceased administering the program in 1975 "pursuant to a memorandum of understanding and the establishment of a state permit program by the State Board." *Chesapeake Bay Found., Inc. v. United States*, 445 F.Supp. 1349, 1352 n.3 (E.D. Va. 1978). Following the approval of a state-run NPDES program, the EPA has continuing oversight responsibilities, in that "[t]he State must advise the EPA of each permit it proposes to issue, and the EPA may object to any permit," and "[i]f the State cannot address the EPA's concerns, authority over the permit reverts to the EPA." *Nat'l Ass'n of Home Builders*, 551 U.S. at 650 n.1.

The first Virginia Pollutant Discharge Elimination System (hereinafter "VPDES") permit that was issued to the Zion Crossroads WWTP in 2002 by the Virginia State Water Control Board expired on March 28, 2007, and is not the subject of the instant suit. *See* Complaint, at ¶¶ 2, 47. The permit application for a reissued permit was completed on August 8, 2007, and on June 5, 2008, DEQ staff transmitted to the EPA by electronic mail a draft permit and fact sheet, which is a document containing the data and rationale underlying an action of the DEQ. *See* Complaint, at ¶¶ 61-65. In the email, DEQ staff stated: "We are trying to get this permit processed quickly, so I'm hoping you can expedite your review. We are trying to get the public comment period started during the week of June 23; it would be helpful if you can get your review completed as early as possible during the week of June

16." *Id.* at ¶ 66. While the Complaint raises several alleged deficiencies in the transmittal to the EPA, it principally alleges that neither the draft permit nor the fact sheet "disclose[d] . . . the material fact that the subject sewage treatment plant is located on the boundary of a National Historic Landmark District that is administered by the National Park Service, and which sewage discharge flows through the Historic District." *Id.* at ¶ 70. On June 12, 2008, the EPA responded by email, stating that "based on our review, we have no objection to the issuance of the permit." *Id.* at ¶ 71. The State Water Control Board subsequently issued the VPDES permit for the Zion Crossroads WWTP on December 4, 2008. *See id.* at ¶ 2.

The non-discretionary duties that the EPA is alleged to have violated arise either directly or indirectly from the National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq.* (hereinafter "NHPA"). Under Section 106 of the NHPA, any federal agency that has "direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State" or "any Federal department or independent agency having authority to license any undertaking" must study ways to avoid or mitigate any adverse impacts the undertaking could have upon historic properties included in, or eligible to be included in, the National Register. *See* 16 U.S.C. § 470f; *see also Tyler v. Cuomo*, 236 F.3d 1124, 1128 (9th Cir. 2000). Section 110 of the NHPA provides that "[p]rior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking." 16 U.S.C. § 470h-2(f).

HGS filed suit in Louisa County Circuit Court challenging the issuance of the permit, and filed a separate suit in this Court. In this action, HGS claims first that in the permit-

approval process, the EPA had failed to perform a non-discretionary duty under the Clean Water Act because it "approved" the permit without consideration of any potential adverse effect upon the Green Springs Landmark District. Alternatively, HGS argues that the EPA failed to perform a non-discretionary duty under the NHPA and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (hereinafter "APA") on the same basis.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007) (internal citations omitted). A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "Factual allegations must be enough to raise the right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all the allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor. *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005).

In sum, Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a Motion to Dismiss." *Ashcroft v. Iqbal*, 556 U.S. ----, 129 S.Ct. 1937, 1950 (2009).

## III. Discussion

### A. Effect of State Court Proceedings

Following the May 17, 2010 hearing on the pending motions to dismiss, the Court directed the parties to supplement the record by filing certain pleadings from the state court action in the Circuit Court for the County of Louisa. On May 20, counsel for Louisa County Water Authority filed the requested materials from the Louisa County action. On May 26, the Court invited the parties to submit additional briefing on the effect of the related state court proceedings (docket no. 33), and the parties have done so.

In the pending state court action, *The Historic Green Springs, Inc. v. Virginia Dep't of Envtl. Quality*, Civ. No. CL 09-20 (Va. Cir. Ct.), HGS appealed the decision of DEQ to grant the Zion Crossroads WWTP permit,[3] which is the same permit at issue in this federal action. On January 28, 2009, HGS and other petitioners filed their Petition for Appeal to the Louisa County Circuit Court, alleging five "errors assigned." The first and fifth are relevant to this case. In the first error assigned, HGS argued that DEQ "fail[ed] to provide notice to downstream riparian owners of receipt of the permit application," and that this failure was "not mere harmless error where property interests affected by the National Historic Preservation Act are at issue." Petition for Appeal, at 15 (docket no. 30). The timely notice of the permit application could have informed the National Park Service and allegedly "triggered consultation in accordance with Section 110 of the National Historic Preservation Act." *See id.* at 16. In the fifth error assigned, HGS argued that DEQ "fail[ed] to disclose information of significance in the permit documentation prior to seeking the required review by the US EPA, thereby conveying defective notice and depriving the US EPA of making an

---

[3] As noted by the EPA, the distinction between the DEQ and Virginia State Water Control Board does not appear to be relevant in regard to the issuance of VPDES permits, *see* EPA's Memorandum in Response to Court's May 26, 2010 Order, at 2 n.2, and thus, the Court will primarily refer to the role of DEQ concerning the issuance of this permit.

informed review in the exercise of its approval." *See id.* at 18. Among other alleged deprivations of "information of significance," HGS argued that DEQ was required to disclose "the fact of the existence of the Natural Historic Landmark District which omission defeated [the] US EPA['s] duty to consult pursuant to Section 110 of the National Historic Preservation Act. *See id.* at 19. Similarly, HGS stated that the EPA "must consult" with the National Park Service under Section 110 of the NHPA, although the EPA was not a party to the Louisa County action. *Id.*

There was initially some uncertainty in the state court action as to whether HGS was raising any claims under the NHPA. Responding to the demurrers of Louisa County and the Commonwealth, HGS clarified that in the fifth error assigned, it was only asserting that DEQ had committed a procedural violation of Virginia law, and that no issue requiring the interpretation of the NHPA was before the state court. *See* Petitioners' Memorandum in Opposition to Demurrers of Respondents and Motion to Withdraw Assignment of Error 1, at 16 (docket no. 30). HGS also moved to withdraw its first error assigned. *See id.* at 1.

On July 17, 2009, the Louisa County Circuit Court issued an oral ruling, in which it recognized "that how these counts are plead makes it less than clear whether NHPA claims are being made or not." Transcript of Court's Ruling taken on July 17, 2009, at 5 (docket no. 30). However, to the extent that such claims were made by HGS, the court sustained the demurrers as to the first and fifth errors assigned. First, the court held that "[t]he provisions of [16 U.S.C. §§ 470f and 470h-2] are by their expressed language limited to federal agencies," and "impose no duties upon the states." *Id.* Second, the court held that the "requirements [of these statutes] only apply to federally funded or federally licensed undertakings and not to undertakings that are merely subject to state or local regulation administered pursuant to a delegation or approval of a federal agency. The petition only

alleges the latter." *Id.* On July 31, 2009, the Louisa County Circuit Court issued an Order sustaining the demurrers as to the first and fifth errors assigned "to the extent that such Errors Assigned state any claim under the federal National Historic Preservation Act." *See* Order on Demurrers and on Motions of Petitioners, at 1 (docket no. 30).

Responding to the Court's invitation to provide additional briefing on the effect of the state court ruling, the EPA argues in its brief that there is no basis upon which the Court should abstain from rendering a decision, and argues that neither the *Rooker-Feldman* doctrine nor collateral estoppel applies under the facts of this case (docket no. 34). HGS concurs with the EPA that the Court should render a decision on the merits of the case (docket no. 37). However, Louisa County Water Authority argues instead that the instant suit "presents a strong case for the Court's abstention" on the basis of the *Younger* and *Colorado River* abstention doctrines, as well as *Rooker-Feldman* (docket no. 36). For the following reasons, the related state court proceedings do not present an obstacle to the Court's issuance of a decision on the merits of this dispute.

### 1. *Younger*

Under the *Younger* abstention doctrine, a federal court is required to abstain from interfering in ongoing state court proceedings, even if the federal court has jurisdiction, where the following test is met: (1) "there are ongoing state judicial proceedings"; (2) "the proceedings implicate important state interests"; and (3) "there is an adequate opportunity to raise federal claims in the state proceedings." *Martin Marietta Corp. v. Maryland Comm'n on Human Relations*, 38 F.3d 1392, 1396 (4th Cir. 1994) (citing *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515 (1982)); *see also Virginia Inst. of Autism v. Virginia Dep't of Educ.*, 537 F.Supp.2d 817, 820 (E.D. Va. 2008). "*Younger* abstention represents an accommodation between a state's pursuit of important interests in its own

forum and the federal interest in federal adjudication of federal rights." *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 165 (4th Cir. 2008). Of course, abstention "is the exception, not the rule." *Ankenbrandt v. Richards*, 504 U.S. 689, 705, 112 S.Ct. 2206 (1992).

It is uncontested that prongs one and two of the *Younger* test have been fulfilled in the instant case. *See e.g.*, EPA's Memorandum in Response to Court's May 26, 2010 Order, at 9-10 (docket no 34). However, crucially, the third factor of the *Younger* test is not met in this case, as HGS and the other petitioners did not have an adequate opportunity to raise the federal claims at issue in this case in state court. In Count One of its Complaint, HGS argues that EPA failed to perform a non-discretionary duty under the Clean Water Act. While the matter does not appear to be entirely beyond dispute, the Court is persuaded that HGS could not have raised its Clean Water Act claim against the EPA in Louisa County Circuit Court because the district courts have exclusive jurisdiction over suits claiming the EPA has failed to perform a non-discretionary duty created by the Clean Water Act. *See* 33 U.S.C. § 1365(a)(2); *see also Nat. Res. Defense Council v. EPA*, 542 F.3d 1235, 1242 (9th Cir. 2008) (holding that "where a plaintiff alleges that the EPA has failed to perform a non-discretionary duty under the CWA and the plaintiff does not challenge the substance of any existing regulations, the district courts have exclusive jurisdiction"). Similarly, Count Two of the Complaint claims that EPA has committed a violation of the NHPA, which is a claim that must be raised pursuant to the APA, and therefore falls within the exclusive jurisdiction of the district courts. *See* Complaint, at ¶¶ 103-04; *see also Boron Oil Co. v. Downie*, 873 F.2d 67, 71 (4th Cir. 1989) (stating that "Congress has expressly limited Administrative Procedure Act review to the federal courts, and a state court's assertion of the power of judicial review over federal agencies directly contravenes 5 U.S.C. § 702"); *Checed Creek, Inc. v. Secretary, U.S. Dept. of Housing and Urban Development*, Civil Action No. 4:06-cv-110, 2007 WL 1238592, at *4

(E.D. Va. Apr. 27, 2007) (noting that "the APA authorizes judicial review without sovereign immunity only in federal court"). Accordingly, because HGS could not have raised the claims in this suit against the EPA in the Louisa County Circuit Court action, the Court finds that a *Younger* abstention is not appropriate. *See Remington v. Mathson*, No. CV 09-4547, 2010 WL 1233803, at *9 (N.D. Cal. Mar. 26, 2010) (finding there was no adequate opportunity for the plaintiff to bring federal environmental claims in state court under, *inter alia*, the CWA, and holding the absence of this third *Younger* factor to be "dispositive" that abstention was not appropriate); *see also Silgan White Cap Americas, LLC v. Alcoa Closure Sys.*, Civil Action No. 08-939, 2009 WL 1177090, at *11 (W.D. Pa. Apr. 29, 2009) (declining to abstain under *Younger* because, *inter alia*, CERCLA claim was subject to the exclusive jurisdiction of the federal courts).

### 2. *Colorado River*

The Fourth Circuit has cautioned that when a district court assesses whether a *Colorado River* abstention is appropriate, it must remain mindful that this form of abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it," and that it should abstain only "where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Great Am. Ins. Co. v. Gross*, 468 F.3d 199, 207 (4th Cir. 2006) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236 (1976)). "[S]olely as a matter of judicial administration," an abstention under *Colorado River* "permits dismissal of a *duplicative* federal action when '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation,' clearly favors abstention." *Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 463 (4th Cir. 2005) (quoting *Colorado*

*River*, 424 U.S. at 817) (emphasis in original). The Court is to weigh the following factors in its assessment of whether a *Colorado River* abstention is appropriate:

> (1) whether the subject matter of the litigation involves property where the first court may assume *in rem* jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights.

*Chase Brexton*, 411 F.3d at 463-64 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15-16, 103 S.Ct. 927 (1983)).

The fourth factor undeniably counts in favor of abstention, not only because the Louisa County action was filed some ten months before the federal court action, but also because the state court has already made a ruling touching upon the first and fifth errors assigned, which concern the merits of the federal court action. This is the only factor that appears to weigh in favor of abstention, and all the remaining factors are either neutral or weigh against abstention. The first and second factors are not implicated in the Court's assessment. The fifth factor, concerning "whether state or federal law provides the rule of decision on the merits," weighs against abstention, as HGS only brings federal causes of action against the EPA in this action for alleged violations of the CWA and the NHPA. The third factor, which is the "desirability of avoiding piecemeal litigation," also weighs against abstention, because HGS could not have raised the claims at issue in this federal action against the EPA in state court. Finally, the sixth factor most strongly weights against abstention. While there was some overlap between the issues raised in the Louisa County Circuit Court action and in this Court, because HGS would not have been able to bring its federal claims against the EPA in state court, that state proceeding was not adequate to

protect its rights. *See e.g., Remington*, 2010 WL 1233803, at *10 (finding *Colorado River* abstention not warranted in part because "the state court cannot adequately protect the rights of a federal litigant raising RCRA, CWA, CERCLA, or EPCRA claims because these claims cannot be raised in state court"); *Mut. Life Ins. Co. of New York v. Mobil Corp.*, No. CIVA961781, 1998 WL 160820, at *5 (N.D.N.Y. Mar. 31 1998) (finding *Colorado River* abstention not warranted for CWA and RCRA claims in part because it was "uncontested that the state and federal lawsuits involve different legal theories and statutes"). Louisa County Water Authority (the only party presently arguing in support of abstention) has not established to the satisfaction of the Court that circumstances warrant disrupting the general rule that "the pendency of an action in the state court is no bar to proceedings concerning the same subject matter in the Federal court having jurisdiction." *Colorado River*, 424 U.S. at 817 (quoting *McCellan v. Carland*, 217 U.S. 268, 282, 30 S.Ct. 501 (1910)).

### 3. *Rooker-Feldman*

Neither is the Court barred from hearing the claims raised by Historic Green Springs due to a lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine.

This doctrine acquired its name from the cases of *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303 (1983), and generally serves to bar district courts from "sit[ting] in direct review of state court decisions." *Feldman*, 460 U.S. at 483 n.16. This doctrine ensures that federal district courts only exercise original jurisdiction, and guarantees that state court judgments are reviewable only upon direct appeal by superior state courts, and eventually, the United States Supreme Court. *See Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 198 (4th Cir. 2000).

Originally, the Fourth Circuit, among other courts, had given the *Rooker-Feldman* doctrine an "expansive reading," *Davani v. Virginia Dep't of Transp.*, 434 F.3d 712, 717 (4th

Cir. 2006), stating that the prohibition on district courts sitting in direct review of state court judgments "extends not only to issues actually decided by a state court but also to those inextricably intertwined with questions ruled upon by a state court. A federal claim is inextricably intertwined with a state court decision if success on the federal claim depends upon a determination that the state court wrongly decided the issues before it." *Id.* (quoting *Barefoot v. City of Wilmington*, 306 F.3d 113, 120 (4th Cir. 2002)).

However, the Supreme Court later significantly cabined the scope of the doctrine in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 125 S.Ct. 1517 (2005). As a result, the doctrine was "confined to cases . . . brought by state court losers complaining of injuries *caused by state court judgments* rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Davani*, 434 F.3d at 718 (quoting *Exxon Mobil*, 544 U.S. at 284) (emphasis added). Importantly, the Supreme Court clarified that *Rooker-Feldman* does not

> stop a district court from exercising subject matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court. If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.

*Davani*, 434 F.3d at 718 (citing *Exxon Mobil*, 544 U.S. at 284, 293). In other words, the question is whether the losing party in state court has "repaired to federal court to undo the [state-court judgment]." *Delmarva Power & Light Co. v. Morrison*, 496 F.Supp.2d 678, 683 (E.D. Va. 2007) (quoting *Exxon Mobil*, 544 U.S. at 293).

The question of whether *Rooker-Feldman* serves to dispossess the Court of subject matter jurisdiction gives it more pause than the questions raised concerning abstention. It appears likely that under prior Fourth Circuit precedent, the issues presented in this suit

would be considered "inextricably intertwined with questions ruled upon by a state court." *Barefoot*, 306 F.3d at 120. The Louisa County Circuit Court ruled that the "requirements [of the NHPA] only apply to federally funded or federally licensed undertakings and not to undertakings that are merely subject to state or local regulation administered pursuant to a delegation or approval of a federal agency. The petition only alleges the latter." Transcript of Court's Ruling taken on July 17, 2009, at 5 (docket no. 30). While the state court also provided an additional basis for its decision to sustain the demurrers, and recognized that it was unclear whether HGS had raised claims under the NHPA at all, its holding that the EPA's role in the permit approval process did not amount to an "undertaking" directly addresses an issue raised in this federal suit.

Now, HGS simply attempts to litigate in federal court a matter that clearly has been previously litigated in state court, irrespective of whether HGS intentionally sought to have questions of the NHPA there raised. The claims brought in federal court are independent of those previously litigated in state court, because they are specifically brought against the EPA and concern the duties it owes under the CWA and the NHPA. However, were the Court to find for HGS in this case, it would need to find that the EPA's "approval" of the permit constitutes an "undertaking" within the meaning of the NHPA. *See* Complaint, at ¶¶ 90-92. This would deny a legal conclusion the state court reached in a case to which HGS was a party. Under these circumstances, it is clear that the *Rooker-Feldman* doctrine is inapplicable, the District Court possesses jurisdiction, and "state law determines whether the defendant prevails under principles of preclusion." *See Davani*, 434 F.3d at 718 (citing *Exxon Mobil*, 544 U.S. at 284, 293).

### 4. State-Law Preclusion

Under Virginia preclusion law, the following conditions must be met in order to serve as a bar to HGS from litigating issues previously decided in the state court:

> (1) the parties to the two proceedings must be the same; (2) the factual issue sought to be litigated must have been actually litigated in the prior proceeding; (3) the factual issue must have been essential to the judgment rendered in the prior proceeding; and (4) the prior proceeding must have resulted in a valid, final judgment against the party to whom the doctrine is sought to be applied.

*Whitley v. Commonwealth*, 538 S.E.2d 296, 299 (Va. 2000). The question before the Court is whether the state court's adjudication of the interpretation of the NHPA, as set forth in its ruling on the first and fifth errors assigned, is binding upon the parties in this litigation. The Court concludes that it is not.

The parties in the two proceedings are not the same. In the Louisa County action, HGS appealed the issuance of the permit and joined as respondents DEQ, the Virginia Water Control Board, and Louisa County Water Authority, among others. In the instant action, HGS instead brought suit principally against the EPA and its Acting Regional Administrator for Region III, but also against the Louisa County Water Authority. The instant suit is "principally" brought against the EPA because, at a minimum, the causes of action asserted in the Complaint only allege that the EPA committed violations of CWA and the NHPA, and do not allege violations on the part of Louisa County Water Authority. *See e.g.*, Complaint, at ¶¶ 101, 103. The Court, applying Virginia law, adheres to the principle of mutuality, which holds that "a litigant is generally prevented from invoking the preclusive force of a judgment unless he would have been bound had the prior litigation of the issue reached the opposite result." *Rawlings v. Lopez*, 591 S.E.2d 691, 692 (2004). The only party seeking to invoke the preclusive force of a judgment is the Louisa County Water Authority,

which was a defendant to the state court action. However, the central defendant in the Louisa County action was DEQ, which is not a defendant in this action, and the central defendant in this action is the EPA, which was not a defendant in the Louisa County action. Even though the EPA was not a party to the Louisa County action, the Court must determine whether it stands in privity with DEQ. Generally, in order for privity to exist, the party's interests must be so identical with another that he can be said to represent the same legal right, *see State Farm Fire & Cas. Co. v. Mabry*, 497 S.E.2d 844 (1998), and the Court's "privity" analysis must take into account all relevant circumstances in any given case, *see Agnstadt v. Atl. Mut. Ins. Co.*, 457 S.E.2d 86, 87-88 (1998). Further, in order to "bind the United States" to an adjudication in a prior case or controversy, the Court must find that the United States pulled "a laboring oar in [that] controversy." *Drummond v. United States*, 324 U.S. 316, 318, 65 S.Ct. 659 (1945).

The Court finds that the EPA and DEQ cannot be considered to be in privity. While both parties are involved in the issuance of NPDES permits, once Virginia assumed responsibility of the permit program, "then state officials – not the federal EPA – have primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight." *Nat'l Ass'n of Home Builders*, 551 U.S. at 560. Therefore, EPA has an oversight role in the state-run NPDES permit issuance process, and one that is carefully circumscribed by the CWA. In fact, if the EPA decides to object to a draft permit by the DEQ and "the State cannot address the EPA's concerns, authority over the permit reverts to the EPA." 551 U.S. at 650 n.1. The interests of the EPA and DEQ therefore are not necessarily in alignment in the context of the permit issuance process in which both entities have a critical role. More specifically in the context of this litigation and the Louisa County proceedings, the interests of the two entities are not identical. The crux of the EPA's

position is that its decision not to object to a draft NPDES permit does not result in an accompanying obligation under the NHPA. *See* EPA's Memorandum in Response to the Court's May 26, 2010 Order, at 16. The principal respondent in the Louisa County action was the DEQ, which in conjunction with the State Water Control Board, submitted the draft VPDES permit to the EPA, held public hearings on the subject, and ultimately issued the permit pursuant to Virginia's authority to do so. Further, as the EPA recognizes, DEQ raised at least one argument in its briefing in the Louisa County action that is antithetical to its position: "Moreover, EPA's involvement should only mean that EPA, as a federal agency, was required to comply with Section 106 prior to giving the concurrence." Commonwealth's Partial Demurrer and Answer, at 5 (docket no. 30). The Court cannot hold under these circumstances that there is an identity of interests. Finally, even if there was an identity of interests between DEQ in the Louisa County action and the EPA in this action, the Court has no basis upon which it could find that the United States pulled "a laboring oar in [the prior] controversy." *Drummond*, 324 U.S. at 318. Accordingly, the Court finds that the EPA, as the principal defendant in this suit, was not a party to nor was in privity with any party to the Louisa County action. Because mutuality between the parties does not exist, the Court cannot find the state court's adjudication of issues with reference to the NHPA bind the parties in this case.

In sum, the Court finds that it has subject matter jurisdiction over this case, that there is no basis upon which it should abstain from rendering a decision on the merits, and that the state court's decision sustaining the demurrers as to the first and fifth errors assigned are not binding upon the parties in this case.

The EPA raises several arguments in its Motion to Dismiss as to how Count One, which alleges violations of the Clean Water Act, is without merit.

First, the EPA argues that the Clean Water Act claim "is premised upon an alleged EPA action that never occurred as a factual matter and, from a legal standpoint, could not have occurred," EPA's Memorandum in Support of its Motion to Dismiss, at 10, which was an "approval of the VPDES permit for the Zion Crossroads WWTP." Complaint, at ¶ 92; *see also id.* at ¶¶ 94, 101. Because the EPA, by statute, had no authority to "approve" the challenged permit, but only receives notice from the State regarding permit applications and may object to the issuance thereof, 33 U.S.C. § 1342(d)(2), the EPA argues that HGS's challenge to its "approval" of the permit fails to state a claim. In response, HGS reiterates its argument in Count One that the EPA "approved" the challenged permit, and that the EPA's review "necessarily rendered a 'decision' not to object." HGS's Memorandum in Opposition to EPA's Motion to Dismiss, at 8. Furthermore, HGS cites the fact that the checklist submitted by the Commonwealth for the EPA's review of the Zion Crossroads WWTP, states that the draft permit is submitted "for Agency review and concurrence" (docket no. 22, ex. B), and argues that "approval" and "concurrence" are functionally equivalent. Notably, HGS only challenges the EPA's alleged *approval* of the permit, and does not raise any challenge to the *failure* of the EPA to object to the issuance of the permit. *See* Complaint, at ¶¶ 86-101; HGS's Memorandum in Opposition to EPA's Motion to Dismiss, at 8 ("The express allegations in Count I are that the EPA *approved* the subject state issued permit . . ." (emphasis added)).

The argument that the EPA's actions (or inaction) in this case amounted to EPA "approval" of an NPDES permit is plainly without merit. Once a State is authorized by the

EPA to administer the NPDES program within its borders, the EPA must within ninety days discontinue the issuance of permits. *See* 33 U.S.C. § 1342(c)(1). Thereafter, "state officials – not the federal EPA – have primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight," *Nat'l Ass'n of Home Builders*, 551 U.S. at 650, the bounds of which are fixed by statute and cannot be reasonably read to permit EPA "approval" of an NPDES permit. *See* 33 U.S.C. § 1342(d); *see also District of Columbia v. Schramm*, 631 F.2d 854, 857 (D.C. Cir. 1980) (recognizing that where a State applied to the EPA to run its NPDES program pursuant to § 1342, "Congress in this scheme thus placed on the states the burden of administering and approving NPDES applications"); *Citizens Alert Regarding the Environment v. U.S. E.P.A.*, 259 F.Supp.2d 9, 18 (D.D.C. 2003) ("[O]nce a state assumes responsibility over the NPDES process, the permits that it approves are considered as having been issued by the state, not by EPA."); *United States v. Confederate Acres Sanitary and Drainage Sys., Inc.*, 767 F.Supp. 834, 836 n.1 (W.D. Ky. 1990) (noting that "NPDES permits are secured from the EPA or from a state upon EPA's approval of the State's program"). Therefore, however HGS chooses to characterize the EPA's actions with respect to the Zion Crossroads WWTP permit, it raises a challenge to the EPA's *failure to object* to the issuance of the permit. However, even so holding, the Court declines the EPA's invitation to dismiss Count One solely on the basis of HGS's "mistaken premise" that the EPA had approved the NPDES permit.

The question is then whether Count One states a claim by alleging that the "EPA failed to perform non-discretionary duties under the Clean Water Act, and thereby the National Historic Preservation Act," Complaint, at ¶ 101, when it failed to object to the issuance of the VPDES permit for the Zion Crossroads WWTP. The Court concludes that HGS has not identified a non-discretionary duty that the EPA has failed to perform by its

conduct (whether characterized as approval or a failure to object) and thus the Court must dismiss Count One for lack of subject matter jurisdiction.

Suits against the EPA and EPA Administrators are barred by sovereign immunity unless there has been a specific waiver thereof, *Sierra Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001), and pursuant to 33 U.S.C. § 1365(a)(2), sovereign immunity has been waived in suits "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." HGS argues that "the EPA had a non-discretionary duty to review the permit in conformance with all applicable CWA regulations," and, "[b]y operation of 40 C.F.R. § 122.49, [the] EPA had a duty to comply with the NHPA." HGS's Opposition to EPA's Motion to Dismiss, at 11. This means, according to HGS, that the EPA was required to create a review as to mitigation of harm to the Green Springs Landmark District, which the EPA allegedly did not undertake. This regulation forms the crux of HGS's argument that the EPA failed to perform a non-discretionary duty. *See e.g.* Complaint, at ¶ 89. The regulation provides, in pertinent part, as follows:

> The following is a list of Federal laws that may apply to the issuance of permits under these rules. When any of these laws is applicable, its procedures must be followed. When the applicable law requires consideration or adoption of particular permit conditions or requires the denial of a permit, those requirements also must be followed.
>
> (b) The National Historic Preservation Act of 1966, 16 U.S.C. 470 et seq. Section 106 of the Act and implementing regulations (36 CFR Part 800) require the Regional Administrator, before issuing a license, to adopt measures when feasible to mitigate potential adverse effects of the licensed activity and properties listed or eligible for listing in the National Register of Historic Places. The Act's requirements are to be implemented in cooperation with State Historic Preservation Officers and upon notice to, and when appropriate, in consultation with the Advisory Council on Historic Preservation.

40 C.F.R. § 122.49(b). Contrary to HGS's assertion, this regulation, by its plain terms, does not "mandate[ ] application of the [NHPA] to the NPDES permit process." Complaint, at ¶ 89. Instead, § 122.49 provides at the outset that the listed Federal statutes may apply "to the issuance of permits under these rules." Even more compelling, the regulation specifically provides that the NHPA "require[s] the Regional Administrator, before issuing a license," to adopt mitigating measures under the NHPA. 40 C.F.R. § 122.49(b). As the Court has previously held, because the EPA has authorized the Commonwealth of Virginia to implement the NPDES program, the permits are approved and issued by the Commonwealth. *See e.g. Citizens Alert Regarding the Environment*, 259 F.Supp.2d at 18. Accordingly, § 122.49 does not mandate the application of the NHPA where the EPA merely reviews a draft NPDES permit transmitted by a State, because in such circumstances the Regional Administrator does not issue a license or permit.

This conclusion is supported by the language, and purposes underlying, 33 U.S.C. § 1342, which draws a distinction between the role of the EPA when it is charged with "issuing" of NPDES permits in certain jurisdictions, *see e.g.*, § 1342(a)(1), and its role after it ceases "issuing" NPDES permits following the authorization of the State program, *see* §§ 1342(c)(1), 1342(d). When the State NPDES program is authorized, it is required to give a copy of each permit application to and notify the EPA of the State's proposed action. *See* 33 U.S.C. § 1342(d)(1). The EPA may then object to an NPDES permit to be issued by a State, but it is not required to do so. *See* 33 U.S.C. § 1342(d)(2); *see also Mississippi River Revival v. Administrator, U.S.E.P.A.*, 107 F.Supp.2d 1008, 1013 (D. Minn. 2000) (noting that when a State is given authority to issue NPDES permits, "there is no [ ] mandatory duty for the EPA to approve or disapprove any permit application or action"). It stands to reason that where the State has thus taken "primary responsibility for reviewing and approving NPDES

discharge permits," *Nat'l Ass'n of Home Builders*, 551 U.S. at 650, the EPA would have a corresponding reduction in responsibility over NPDES permits in that State. The Court has concluded that, by its own terms, the most natural reading of 40 C.F.R. § 122.49 does not "mandate[ ] application of the [NHPA] to the NPDES permit process," Complaint, at ¶ 89, where the EPA does not "issue" NPDES permits. Further, the language and purposes underlying the CWA provisions on the transfer of authority of the NPDES permit process to States support the Court's interpretation. *Cf. Secretary of Labor, Mine Safety & Health Admin. v. Western Fuels-Utah, Inc.*, 900 F.2d 318, 320 (D.C. Cir. 1990) ("[A] regulation must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute it implements.").

Therefore, HGS has not established to the satisfaction of the Court that its CWA claim alleges the "failure of the Administrator to perform any act or duty under this chapter *which is not discretionary* with the Administrator," 33 U.S.C. § 1365(a)(2) (emphasis added), and therefore has not established a specific waiver of sovereign immunity. Accordingly, Count One of the Complaint will be dismissed for lack of subject matter jurisdiction, in an accompanying Order, to follow.

The Court must also dismiss Count Two, which alleges "that the EPA violated the [Administrative Procedure Act] (1) for failure to perform nondiscretionary duties; and (2) for performing an unlawful approval not in accordance with law, without observance of procedure required by law, and unsupported by substantial evidence." Complaint, at ¶ 103. Because the NHPA does not contain a private cause of action, HGS must bring its claim under the APA. *See Karst Envtl. Educ. & Protection, Inc. v. E.P.A.*, 475 F.3d 1291, 1295 (D.C. Cir. 2007). Judicial review is unavailable under the APA where the challenged "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

At the outset, the Court has previously rejected its characterization of the EPA's conduct as constituting "approval" of the permit. However, again the Court will not dismiss the claim solely on the basis of HGS's "mistaken premise" that the EPA had "approved" the NPDES permit, and will proceed to address the relevance of this distinction in the circumstances of this case. The Court has also previously rejected the claim that the EPA had a non-discretionary duty to apply the NHPA to the NPDES permit process through 40 C.F.R. § 122.49. With respect to HGS's APA claim, no specific basis for why the EPA has "fail[ed] to perform nondiscretionary duties" has been alleged. Complaint, at ¶ 103. However, even assuming, *arguendo*, that HGS alleges in this paragraph that the NHPA is the source of such a duty, the Court finds no such duty in the statute.

In the context of its APA claim, HGS argues that the NHPA triggered a nondiscretionary duty on the part of the EPA. In particular, HGS cites to Section 110(f) of the NHPA, which states, in pertinent part, as follows:

> Prior to the *approval* of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.

16 U.S.C. § 470h-2(f) (emphasis added). This statute is read in context of the statutory definition of the meaning of "Undertaking" under the NHPA:

> As used in this Act, the term –
>
> (7) "Undertaking" means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including –
> (A) those carried out by or on behalf of the agency;
> (B) those carried out with Federal financial assistance;
> (C) *those requiring a Federal* permit license, or *approval*; and

> (D) *those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.*

16 U.S.C. § 470w (emphasis added by HGS).

Again, the distinction between "approval" and the "failure to object" is material in the context of these two statutes, and is not merely a mater of semantics. Under the CWA, the EPA is not in a position to "issue" or "approve" proposed permits where the State has been authorized to implement the NPDES scheme, at which point the EPA's role is generally limited to review and potential objection. Similarly, the weight of persuasive authority concerning the NHPA supports the distinction between the affirmative action on the part of a Federal agency, which gives rise to the cited duties under the NHPA, and the failure to object or intervene, which does not. *Cf. Nat'l Trust for Historic Preservation v. Dep't of State*, 834 F.Supp. 443, 450 (D.D.C. 1993) (with respect to the statutory definition of "Federal undertaking" in the NHPA, the court held that "[a] judicial interpretation of 'license' as including not only explicit written permission but also a failure to veto a project when possible would read all limitations out of the Act. The Court declines plaintiffs' invitation to apply NHPA so broadly."), *aff'd in part, rev'd in part, Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750, 755 (D.C. Cir. 1995) ("The State Department's failure to disapprove Turkey's proposal may have been a prerequisite to Turkey's project going forward, but it cannot itself be an undertaking within the meaning of the statute.").

Accordingly, the Court cannot find that EPA's failure to object to the issuance of a draft NPDES permit satisfies the definition of "approval" in the NHPA context. Therefore, Section 110(f) of the NHPA does not necessitate action on the part of the EPA, irrespective of the definition of "undertaking." HGS has not identified any other potential bases for EPA's alleged failure to perform a nondiscretionary duty, and the Court finds

none. Because both grounds raised supporting the APA claim are therefore found to be without merit, Count Two will be dismissed, in an accompanying Order, to follow.

Finally, considering that the only two causes of action in this Complaint are alleged solely against the EPA, and both causes have been dismissed in accordance with this Memorandum Opinion, Defendant Louisa County Water Authority's Motion to Dismiss will be denied, as moot, in an accompanying Order, to follow.

It is so ORDERED.

The Clerk of the Court is hereby directed send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this __29th__ day of September, 2010.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE